ROBERT M. HALLEY & another[1] vs. VINCENT P. BIRBIGLIA
& another.[2]

Worcester. September 14, 1983. — December 7, 1983.

Present: HENNESSEY, C.J., WILKINS, NOLAN, & LYNCH, JJ.

*Doctor*, Duty to disclose to patient. *Medical Malpractice*, Consent to
medical treatment. *Negligence*, Medical malpractice.

The principle that a physician owes to his patient a duty of disclosure, as
expressed in *Harnish* v. *Children's Hosp. Medical Center*, 387 Mass.
152 (1982), was given retroactive effect by this court in a medical mal-
practice case based on events occurring before the date of that deci-
sion. [544-547]
In an action by a minor plaintiff and his father based on the defendant's
failure to disclose the material risks of an arteriogram administered to
an infant, the plaintiffs' offer of proof before a medical malpactice
tribunal was sufficient to raise a question appropriate for judicial in-
quiry with respect to the physician who had performed an arteriogram
on the minor plaintiff, but was insufficient with respect to a physician
whose only relationship with the patient was that of a neurological
consultant. [548-550]

CIVIL ACTION commenced in the Superior Court Depart-
ment on March 15, 1982.

After consideration of the case by a medical malpractice
tribunal, motions to dismiss were heard by *Mulkern, J.*

After review was sought in the Appeals Court, the Supreme
Judicial Court ordered direct appellate review on its own
initiative.

*John F. Hurley, Jr.,* for the plaintiffs.
*David M. Gould* for Karl J. Benedict.

---

[1] The complaint was brought by Michael Halley, father and next friend
of Robert M. Halley. Michael Halley is also a plaintiff in this action.

[2] Karl J. Benedict.

*Douglas Q. Meystre* for Vincent P. Birbiglia.

LYNCH, J.   This case is before us on appeal from a judgment of the Superior Court dismissing the plaintiffs' complaint alleging medical malpractice against the defendants. A medical malpractice tribunal, convened pursuant to G. L. c. 231, § 60B, heard the plaintiffs' claims of negligence and lack of informed consent brought against the defendant Doctors Birbiglia and Benedict, and found that the plaintiffs' offer of proof was not sufficient to raise a question appropriate for judicial inquiry.   The plaintiffs elected not to post a bond in accordance with G. L. c. 231, § 60B, and, as a result, a judge of the Superior Court dismissed their action.   The plaintiffs appealed, and we transferred the case to this court on our own motion.   We sustain the judgment of the Superior Court as to Dr. Birbiglia, but reverse the dismissal of the plaintiffs' action against Dr. Benedict.

As an initial matter, this appeal is properly before us since it is for the plaintiffs "to decide whether [they are] willing to assume the potentially fatal risks of pretrial review after failing or refusing to file a bond," such risks to include that "of being out of court entirely if [their] claim of error by the tribunal is decided adversely." *McMahon* v. *Glixman,* 379 Mass. 60, 64 (1979).   Our standard of review in this action is akin to that used in evaluating a defendant's motion for a directed verdict; the plaintiffs must present evidence sufficient to raise a question suitable for judicial inquiry, however, any "appraisal of the weight and credibility of [such] evidence is impermissible." *Gugino* v. *Harvard Community Health Plan,* 380 Mass. 464, 468 (1980).   See *Kapp* v. *Ballantine,* 380 Mass. 186, 191 (1980).

We summarize the material allegations contained in the plaintiffs' offer of proof.   The plaintiff, Robert M. Halley, a child approximately one and one half years old at the time of the circumstances at issue, was admitted to St. Vincent Hospital in Worcester, on October 9, 1974.   Following a routine immunization shot some weeks before, Robert's parents noticed that he had developed a limp in his left leg, and they brought him to the hospital for examination.   From

Robert's admission until October 16, 1974, among the medical personnel evaluating Robert's condition was the defendant Dr. Vincent P. Birbiglia, a neurologist. Dr. Birbiglia ordered a series of neurological tests to be performed during this period, all of which yielded negative or inconclusive results.

On or about October 17, Dr. Birbiglia determined that it would be advisable for Robert to receive an arteriogram, a procedure by which a catheter is passed into an artery and thereafter a dye is injected, which can then often be employed as a valuable tool in diagnosis. On appeal, the plaintiffs do not contest the appropriateness of this procedure. The arteriogram was performed on Robert by the defendant Dr. Karl J. Benedict, a radiologist, on the morning of October 18, and appeared to proceed without incident. However, after Robert returned to his room from the test, it was noticed that his lower right extremity was cool and that there was an absence of a pulse in the superficial femoral artery. This condition, induced by blood clots, steadily worsened and an operation that evening was unable to restore blood flow to Robert's right leg.[3]  A second operation was performed the next day, and this time blood flow was restored to the leg. However, the latter operation was too late to save Robert's foot, which after extended observation was finally amputated on December 11, 1974.

The plaintiffs allege that both doctors failed to obtain an informed consent to the performance of the arteriogram, and that such failure amounts to medical malpractice. The plaintiffs' affidavit states that neither defendant discussed the risks of the medical procedure with them and further claims that other hospital personnel (not named as defendants) assured them that the procedure was a safe one. Further, the plaintiffs' expert, Dr. W. Robert Felix, Jr., ob-

---

[3] The medical malpractice tribunal found sufficient evidence to raise a legitimate question of liability regarding the surgeon performing this operation. Thus, there is no need to describe here in detail the plaintiffs' allegations of negligence concerning the attempts to restore blood flow to Robert's leg.

served that " it is customary to disclose the risk associated with an arteriogram and this is especially true when the patient is less than a year and one half old because there are known risks, especially thrombosis [clotting], which accompany an arteriogram and the incidence of occurrence is greatly increased when the arteriogram is performed on a child."[4]

In response, the defendants argue that at that time neither of them had a duty to inform Robert's parents of any significant risks involved in the contemplated test. The medical malpractice tribunal agreed, noting that it did not "think that the state of the law . . . in Massachusetts . . . permits a conclusion of negligence merely from a failure to give informed consent." The tribunal went on to "state for the record that, as a matter of law if it were otherwise, there would be adequate evidence in this case to show that there was not informed consent, that is to say, the parents' affidavits would suffice to carry the case to the jury."

---

[4] In his brief, counsel for Dr. Benedict attacks the credentials of Dr. Felix, placing emphasis upon the fact that Dr. Felix was not licensed to practice medicine in Massachusetts (although he was licensed in another State) at the time of the events at issue. Aside from the fact that such a challenge should have been made before the medical malpractice tribunal rather than here for the first time, we feel that, even if it had been made previously, it should be accorded little weight. The standard for the admission of expert testimony before a medical malpractice tribunal is an extremely lenient one. As we stated in *Kapp* v. *Ballantine*, 380 Mass. 186, 192 (1980), "the tribunal should give consideration to the proffered opinion of an expert if the offer of proof is sufficient to show that a trial judge in his discretion *might properly rule* that the qualifications of the witness are sufficient" (emphasis in original). Further and more to the point, it has been fifteen years since we rejected the "community" rule for determining what is good medical practice in negligence cases. *Brune* v. *Belinkoff*, 354 Mass. 102 (1968). Instead, a medical specialist should be judged by his professional peers, regardless of their geographical location. "[A] specialist should be held to the standard of care and skill of the average member of the profession practising the specialty, taking into account the advances in the profession." *Id.* at 109. At this stage of the case the fact of Dr. Felix's failure to be licensed to practice in Massachusetts in 1974 (he is currently licensed in the State) is not a material one in evaluating his qualifications.

Although the doctrine of informed consent has existed in various forms since Justice (then Judge) Cardozo's sweeping assertion of it in 1914, *Schloendorff* v. *Society of the N. Y. Hosp.*, 211 N.Y. 125 (1914),[5] overruled on other grounds, *Bing* v. *Thunig*, 2 N.Y.2d 656 (1957), Massachusetts courts have not expressed an opinion either in support of or against the doctrine until relatively recently. In *Harnish* v. *Children's Hosp. Medical Center*, 387 Mass. 152 (1982), which was decided after the tribunal's ruling, we explicitly endorsed the doctrine for the first time, holding that "a physician's failure to divulge in a reasonable manner to a competent adult patient sufficient information to enable the patient to make an informed judgment whether to give or withhold consent to a medical or surgical procedure constitutes professional misconduct and comes within the ambit of G. L. c. 231, § 60B." *Id.* at 154-155.

The defendants argue that the *Harnish* decision should not be applied retroactively to events occurring in 1974, noting that by its terms the opinion does not state whether it is retroactive or merely prospective. If it is applied to the 1974 arteriogram, the defendants claim, this will penalize doctors for failing to obtain informed consent at a time when such consent was not yet legally required. We find no merit in these contentions.

In general, changes in the common law brought about by judicial decisions are given retroactive effect. *Tucker* v. *Badoian*, 376 Mass. 907, 918-919 (1978) (Kaplan, J., concurring). Certain exceptions have been carved out of this general guideline, which we reviewed in some detail in *Pay-*

---

[5] In what was essentially an unauthorized treatment case (involving the removal of a tumor from an anesthetized patient who had only consented to an examination) rather than one concerning the disclosure of risks prior to an operation, Justice Cardozo stated broadly that "[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body." 211 N.Y. at 129. This language provided the impetus for early decisions specifically adopting the doctrine of "informed consent," i.e., the duty of disclosure of the material risks of a medical procedure. See, e.g., *Salgo* v. *Leland Stanford Jr. Univ. Bd. of Trustees*, 154 Cal. App. 2d 560, 578 (1957); *Natanson* v. *Kline*, 186 Kan. 393 (1960).

*ton* v. *Abbott Labs,* 386 Mass. 540 (1982), and which merit brief repetition here. As an initial matter, the class of decisions given only prospective application is usually limited to contract and property law cases, in which reliance upon existing judicial precedent often influences individual action. See *Johnson Controls, Inc.* v. *Bowes,* 381 Mass. 278 (1980) (insurance contracts); *Rosenberg* v. *Lipnick,* 377 Mass. 666 (1979) (antenuptial contracts). By contrast, under tort law, "reliance plays a much smaller part. . . . [I]t would be unreasonable to assert that potential tortfeasors often reflect upon possible tort liability before embarking on a negligent course of conduct." *Payton* v. *Abbott Labs, supra* at 565-566.

Such hypothetical reliance upon judicial precedent is especially unlikely in the instant case. Although the theory of informed consent was not explicitly recognized in Massachusetts until 1982, no Massachusetts court had rejected it prior to that time. On two occasions, we declined to express any opinion on the doctrine, since it was not squarely presented for decision. See *Superintendent of Belchertown State School* v. *Saikewicz,* 373 Mass. 728, 739 (1977); *Schroeder* v. *Lawrence,* 372 Mass. 1, 4-5 (1977). However, even a brief survey of decisions in other jurisdictions and related Massachusetts case law would have persuaded a rational observer of the folly of drawing any negative inference from the lack of Massachusetts precedent in 1974. Prior to 1974, a great many courts and commentators had already endorsed varying forms of the doctrine of informed consent.[6]

_____

[6] See, e.g., *Salgo* v. *Leland Stanford Jr. Univ. Bd. of Trustees,* 154 Cal. App. 2d 560, 578 (1957); *Natanson* v. *Kline,* 186 Kan. 393 (1960); *DiFilippo* v. *Preston,* 53 Del. 539 (1961); *Govin* v. *Hunter,* 374 P.2d 421 (Wyo. 1962); *Bowers* v. *Talmage,* 159 So. 2d 888 (Fla. App. 1963); *Roberts* v. *Young,* 369 Mich. 133 (1963); *Aiken* v. *Clary,* 396 S.W.2d 668 (Mo. 1965); *Grosjean* v. *Spencer,* 258 Iowa 685 (1966); *Wilson* v. *Scott,* 412 S.W.2d 299 (Tex. 1967); *Kaplan* v. *Haines,* 96 N.J. Super. 242 (1967), aff'd 51 N.J. 404 (1968); *Nishi* v. *Hartwell,* 52 Hawaii 188 (1970); *Canterbury* v. *Spence,* 464 F.2d 772 (D.C. Cir.), cert. denied, 409 U.S. 1064 (1972); *Cobbs* v. *Grant,* 8 Cal. 3d 229 (1972); *Wilkinson* v. *Vesey,* 110 R.I. 606 (1972). Cf. Waltz & Scheuneman, Informed Consent to Therapy, 64 Nw. U.L. Rev. 628 (1970) ("The doctrine of 'informed con-

Its precursors could also be seen in Massachusetts, in prior decisions on related issues which indicated support for a broad, rather than narrow, construction of a physician's duty of disclosure. See *Berardi* v. *Menicks,* 340 Mass. 396 (1960) (failure to inform patient that surgical procedure was not complete and that additional operation was required could be found to be negligence); *Haggerty* v. *McCarthy,* 344 Mass. 136 (1962) (failure to complete operation which resulted in substantial medical risk may create duty to inform). Such cases, and developments in other jurisdictions, cast doubt on any claims of reasonable reliance on judicial precedent advanced by the defendants.

In addition to focusing on reliance as a key factor in determining whether a decision should be given retroactive effect, our opinion in *Payton* highlighted another aspect of the determination: "whether the purposes of the rule will be served by retroactive application." 386 Mass. at 569. In *Harnish,* we stated that the purpose of the informed consent doctrine is "to enable the patient to make an informed judgment whether to give or withhold consent to a medical or surgical procedure" (387 Mass. at 154-155), thereby protecting an individual's interest "in being free from nonconsensual invasion of his bodily integrity." *Id.* at 154, quoting *Superintendent of Belchertown State School* v. *Saikewicz,* 373 Mass. 728, 738-739 (1977). When information regarding the risks of a medical procedure is not provided, this purpose is not served. Money damages, whether levied retroactively or prospectively, are an appropriate means by which a patient's interests are protected and his injuries compensated. Therefore, "retroactive application should follow unless strong equity or policy reasons dictate otherwise." *Payton, supra* at 569. The major policy reason which the defendants advance is one which they characterize as "equity," that a decision which requires certain affirmative conduct cannot fairly be applied to actions predating the deci-

---

sent' has achieved a status in the law of medical malpractice unmatched both in speed of growth and bulk of commentary").

sion. As we have noted, retroactivity has been the rule rather than the exception in tort cases. See, e.g., *Pevoski* v. *Pevoski,* 371 Mass. 358, 361 (1976); *Bouchard* v. *DeGagne,* 368 Mass. 45, 49 (1975); *Diaz* v. *Eli Lilly & Co.,* 364 Mass. 153, 167 (1973). As a matter of "equity," there is no justification for treating the defendants in the instant case differently from defendants in other tort actions.[7]

Our decision to apply *Harnish* retroactively in this case is given further support by the fact that, independent of the precise legal status of the informed consent doctrine in 1974, as a simple matter of negligence, disclosure of the material risks of an arteriogram administered to an infant was arguably good medical practice at that time. The plaintiffs' expert expressed this conclusion in his affidavit, stating that "it was a deviation from good and acceptable practice for a physician to fail to advise parents of the risks and present to them the feasibility of alternatives" to the arteriogram. In *Brune* v. *Belinkoff,* 354 Mass. 102 (1968), we held that the appropriateness of a medical procedure must be assessed with reference to standards of the medical profession as a whole, and we explicitly overruled prior decisions which had permitted defendants to seek refuge in standards of practice preserved as a matter of local custom rather than professional wisdom. Taking into account our decision six years earlier in *Brune,* it was not reasonable for the defendants to draw the negative inference in 1974 that our failure explicitly to adopt the informed consent doctrine absolved them completely of a duty of disclosure. Such a duty may have already become a component of good medical practice among local practitioners, and it had certainly gained sufficient acceptance nationwide to apprise the defendants of its significance.

Hence we rule that a physician's duty of disclosure, as it is described in *Harnish* v. *Children's Hosp. Medical Center,* 387 Mass. 152 (1982), should be applied in the instant case. But this only completes half of our task. On whose shoulders

---

[7] For a different view, see *Scott* v. *Bradford,* 606 P.2d 554 (Okla. 1979).

should the duty of disclosure fall?  To answer this question, the framework which we developed in *Harnish* must be examined in greater detail.

Essentially, *Harnish* sets forth a dual-tiered requirement for recovery in informed consent actions:  (1) the physician must have a duty to disclose the information at issue to the patient, and (2) the breach of that duty must be causally related to the patient's injury.  In turn, the first tier of the requirement contains several components:  (a) a sufficiently close doctor-patient relationship must exist; (b) the information subject to disclosure must be that which the doctor knows or reasonably should know; (c) the information must be of such a nature that the doctor should reasonably recognize that it is material to the patient's decision; and (d) the doctor must fail to disclose the subject information to the patient.  We will direct our attention initially to the question whether the plaintiffs' offer of proof established a sufficiently close doctor-patient relationship between either defendant and the patient.

In *Harnish*, which involved a failure to disclose the risks of a surgical procedure, we found that a sufficient doctor-patient relationship existed between the patient and two defendants, the surgeon and one of his two assistants. 387 Mass. at 158-159.  That assistant had discussed the potential consequences of the operation with the patient, but had failed to mention the risk which later materialized.  However, as to the second assistant, who did not have contact with the patient we found that the patient's offer of proof was insufficient to raise a question appropriate for judicial inquiry.  We perceive roughly the same differentiation of involvement in the patient's affairs in the offer of proof in this case with respect to Doctors Birbiglia and Benedict.

As the hospital reports submitted in evidence indicate, Dr. Birbiglia's relationship with the patient was that of a neurological consultant; he saw Robert intermittently during the period prior to the performance of the arteriogram. He was not the admitting or attending physician, he was not the physician who formally ordered the arteriogram

(although he did recommend its performance),[8] he did not perform the arteriogram, and he was not one of the medical personnel who spoke with Robert's parents and assured them of the safety of the test.[9] The plaintiffs' expert offered no opinion as to why a duty to inform should be levied on Dr. Birbiglia, and the plaintiffs submitted no case precedent to support the extension of the informed consent doctrine to an individual so tangentially involved in the performance of a medical procedure. Nor should Dr. Birbiglia be held responsible for any negligence or breach of a disclosure duty by Dr. Benedict; Dr. Benedict was not his agent nor under his direct control. See *Barrette* v. *Hight,* 353 Mass. 268 (1967); *Withington* v. *Jennings,* 253 Mass. 484 (1925). The plaintiffs failed to establish that a sufficiently close doctor-patient relationship existed as to Dr. Birbiglia and therefore we find no informed consent liability on his behalf.

We do find, however, that the plaintiffs' offer of proof was sufficient to establish such a relationship in the case of Dr. Benedict. Dr. Benedict not only performed the arteriogram but was also in a position to discuss the procedure with Robert's parents and to highlight the risks associated with the test. Although the record is silent as to the nature of his contact with the parents prior to the performance of the arteriogram, he did discuss the procedure with them immediately after its completion. His situation was not unlike that of the surgeon in *Harnish,* as to whom we also found that a sufficiently close doctor-patient relationship existed. In a case involving injuries caused by radiation therapy, the risks of which had not been disclosed to the patient, the Supreme Court of Rhode Island arrived at a similar result

---

[8] The record is somewhat obscure on this point. While Dr. Birbiglia's consultant's notes contains the direction to "proceed" with the arteriogram, another unidentified doctor appears actually to have given the order to commence the procedure.

[9] As noted earlier, with the exception of Dr. Benedict's role in performing the arteriogram, references to other medical personnel in this discussion relate to individuals not named as defendants.

by finding a duty on the part of the radiologists performing the procedure to disclose the attendant risks. In this regard, the Supreme Court of Rhode Island observed that "it is completely unjust and unwarranted to insulate [the defendant radiologists] from the responsibility relating to the disclosure or nondisclosure of the risks inherent in the use of deep radiation therapy and passing [*sic*] this obligation on to the chest specialist or the family physician." *Wilkinson* v. *Vesey*, 110 R.I. 606, 627 (1972). See *Natanson* v. *Kline*, 186 Kan. 393 (1960).

The plaintiffs' offer of proof also appears to satisfy the other elements set out in *Harnish* which give rise to a duty to obtain an informed consent. The plaintiffs' expert, Dr. Felix, stated in an affidavit that the possibility of thrombosis (i.e., clotting) in an arteriogram administered to an infant was a "known risk," and Robert's parents stated by affidavit that no disclosure of this risk was ever made. Dr. Felix also stated in his affidavit that "one of the known risks materialized, that is, a thrombosis, the existence of which was determined following the arteriogram and the correcting of which was attempted" by the later operations.

The plaintiffs' offer of proof was sufficient to raise a question appropriate for judicial inquiry regarding Dr. Benedict's failure to obtain an informed consent to the performance of an arteriogram. As to Dr. Benedict, the judgment of the Superior Court is reversed; as to Dr. Birbiglia, the Superior Court's judgment dismissing the plaintiffs' action is affirmed.

*So ordered.*