Rouse, J.
BACKGROUND
Upon special questions, the jury in this medical malpractice action returned a verdict against two of the three defendant physicians for severe personal injuries suffered by the minor plaintiff, Danielle Hall (Danielle), as a result of the defendants’ negligence during Barbara Hall’s labor and delivery on March 26, 1985, and as a result of failing to inform her of significant medical information. The plaintiffs alleged that the defendants failed to respond to signs that Danielle was in distress during labor and failed to perform a cesarean section which caused Danielle to suffer a serious lack of oxygen during the latter part of labor, resulting in devastating and permanent brain injury. Today, Danielle is blind, deaf, profoundly retarded, unable to eat or swallow, has almost no use of her arms and legs, cannot speak or communicate in any clear way and needs round-the-clock acute nursing care.
Specifically, the jury returned verdicts against Stephen Evans, M.D. (Dr. Evans), the attending physician, and Ely Brand, M.D. (Dr. Brand), a fourth-year resident, on both negligent and informed consent claims. The jury found in favor of John Goldman, a first-year resident, on both claims. The jury awarded 18.5 million dollars to Danielle for future medical expenses, lost earning capacity, and pain and suffering; and 1.5 million dollars to her mother Barbara Hall for loss of consortium.
Now before the court are the motions of Drs. Evans and Brand for judgment notwithstanding the verdict and, in the alternative, for a new trial. The defendants raise numerous issues, including contentions that the expert opinion evidence was premised upon speculation and conjecture, that the juiy was improperly instructed, that the damages were excessive and punitive and, generally, that the verdict was against the weight of the evidence. In considering these motions, I have reviewed all submissions, relevant case law and relevant portions of the trial transcript. I conclude that there were deficiencies in proof on the informed consent claims requiring the allowance of defendants’ motions but that the evidence on negligence was sufficient to withstand the post-trial challenges.
DISCUSSION
The discretion of the trial court in ruling on a motion for judgment notwithstanding the verdict and for a new trial is narrowly circumscribed. The touchstone of the trial judge’s function in evaluating these motions is to consider all the evidence in the light most favorable to the non-moving party. The court cannot weigh the evidence, consider the credibility of the witnesses nor substitute its judgment of the facts for that of the jury. The court’s function is limited to determining whether the verdict is one that no reasonable jury could have reached on any view of the evidence. Tosti v. Ayik, 394 Mass. 482, 494 (1985); Mullins v. Pine Manor College, 389 Mass. 47, 56 (1983). If “anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff,” the trial judge cannot allow the motions. Colter v. Barber-Greene Co., 403 Mass. 50, 54 (1988), citing Raunela v. Hertz Corp., 361 Mass. 341, 343 (1972). In other words, if there is any rational basis for the juiy’s verdict, it must stand.
Furthermore, a motion for judgment notwithstanding the verdict may not be granted unless the same grounds were timely and specifically raised by a motion for directed verdict made at the close of evidence. Rule 50 of the Mass.R.Civ.P., Bonofiglio v. Commercial Union Insurance Co., 411 Mass. 31, 34 (1991).
The defendants challenge the sufficiency of the evidence on both negligence and causation. The crux of the defendants’ argument concerns the accuracy and importance of fetal scalp pH measurements performed at approximately 7:45 p.m., about 25 minutes before Danielle was born. The defendants contend that these measurements conclusively established that Danielle was not deprived of oxygen due to any event that occurred in the immediate time of labor and delivery and that, therefore, delivery by cesarean section was not warranted.
The plaintiffs’ experts, Morris Wortman, M.D. (Dr. Wortman) and Leon Charash, M.D. (Dr. Charash), opined that the fetal heart rate abnormalities, the presence of thick meconium (fetal bowel movement) in the amniotic fluid, and Danielle’s low biophysical profile score all indicated fetal distress which necessitated delivery by cesarean section by about 6:30 p.m. Both Drs. Wortman and Charash conceded that if the scalp pH measurements were accurate, Danielle was not hypoxic (inadequate oxygen supply) due to any event that occurred in the immediate time of labor and delivery. They also admitted that there was no concrete evidence that these scalp measurements were inaccurate. Defendants contend that because there was no direct evidence that these measurements were inaccurate that any opinion that Danielle was hypoxic was speculative and should be stricken.
The important point, however, is that neither plaintiffs’ expert was asked to assume, as a basis for his opinion, that the scalp pH sample was inaccurate. Both Dr. Wortman and Dr. Charash based their opinions on the fetal heart rate abnormalities, the presence of meconium and the biophysical profile. They discounted the results of the scalp pH because, as they explained, the scalp pH measurements were not consistent with other signs of fetal distress and because, *130 in their opinion, pH measurements in general can be erroneous due to poor sampling technique, contamination from the mother’s blood or from meconium, as well as from poorly calibrated machinery.
This was a classic battle of expert witnesses. The defendants’ experts concluded that because there was no evidence that the scalp pH measurements were done improperly or were inaccurate, that Danielle’s brain injury occurred at some time during gestation due to some inexplicable cause unrelated to the defendants’ care and treatment. The defendants argue that the jury was required to accept the scalp pH measurements as accurate and that they completely contradicted other signs of fetal distress.
All of the contentions now advanced by the defendants were ably put before the jury by defendants’ counsel. The jury heard extensively about the significance of the scalp pH samples, all of the other indicia of fetal distress, and all the other medical evidence and theories about when and why Danielle’s hypoxia occurred . The j ury was not required to believe that the scalp pH measurements were accurate or that they were medically conclusive on whether a fetus is receiving an adequate oxygen supply. The jury was free to credit as much or as little of the expert testimony as it chose.
The fact that the court might have come to a different conclusion and assessment about the evidence cannot be grounds to allow the defendants’ post-trial motions. Ordinarily, the question of negligence is one of fact for the jury. Zezuski v. Jenny Manufacturing Co., 363 Mass. 324, 327 (1973). The plaintiffs’ proof of negligence did not turn on the assumption that the scalp pH measurements were wrong and the jury was not required to believe that these measurements were accurate. There was sufficient evidence not based on conjecture or surmise from which the jury could have concluded that the defendants were negligent.
The question of causation is also generally one of fact for the jury. Id. at 328. An expert’s opinion based on facts in evidence is sufficient proof of causation. There was sufficient evidence before the jury to conclude that there was a greater likelihood that the harm suffered by Danielle was caused by the defendants’ conduct than to some other cause for which the defendants were not responsible.
Under their second claim of informed consent, the defendants advanced two theories. The first theory was that Dr. Brand failed to comply with his obligation to inform Barbara Hall that he was a fourth-year resident and that this caused Danielle’s damage. The second theory was that Drs. Brand and Evans failed to inform Barbara Hall of all significant medical information that was material to her decision concerning her medical treatment, in essence, the risks of delivering vaginally and the alternatives of delivering by cesarean section.
With respect to the first theory asserted against Dr. Brand, plaintiffs expert, Dr. Wortman, opined only that every resident has an obligation to inform his or her patient of his rank and role within the treatment team.[1] The evidence, construed in the light most favorable to the plaintiffs, was that Dr. Brand did not so inform Barbara Hall. Although Dr. Brand testified that his usual practice was to inform patients of his status, the jury was free to discredit his testimony and adopt Barbara Hall’s to the effect that no one ever explained his status or rank. However, the plaintiffs failed to present sufficient evidence that Barbara Hall would have refused treatment from Dr. Brand had she been informed of his status or that Dr. Brand’s failure to inform her was causally related to any damages suffered by Danielle. Barbara Hall never testified that she would have refused treatment from Dr. Brand had she known he was a resident. She merely testified that she would have wanted to speak with someone more senior to Drs. Goldman and Brand. Further, there was no expert testimony that Dr. Brand’s failure to inform Barbara Hall was causally related to Danielle’s injuries. There was no testimony that Dr. Brand was not a qualified fourth-year resident, or that someone more senior than a fourth-year resident was required to manage Barbara Hall’s labor and delivery.
Where two or more theories of liability are presented to the juiy, and there is no way of determining which of the two theories the jury relied upon in rendering its verdict, a new trial must be granted if one of those theories is unsupported by the evidence in the case. McInnis v. Town of Tewksbury, 19 Mass.App.Ct. 310, 314 (1985), review denied, 394 Mass. 1103 (1985). Plaintiffs’ proof on the informed consent claim under the theory that Dr. Brand breached his duty to disclose his status and that this failure caused Danielle’s injuries was fatally defective; therefore, Dr. Brand’s motion for a new trial must be granted on the plaintiffs’ claim of informed consent.
Since Dr. Evans was not a resident, the defendants pressed their informed consent claim against him only on the ground that he should have informed Barbara Hall of the signs of fetal distress and available options for delivery. Dr. Evans was the attending physician on duty the evening Barbara Hall delivered. In that capacity, he consulted with Drs. Goldman and Brand at approximately 6:40 pm after reviewing the medical records and test results. Dr. Evans did not perform any of the medical tests on Barbara Hall or even participate in her pre-natal care prior to her admission on March 26.
Barbara Hall testified that she did not know who Dr. Evans was and that she had never seen him before trial. Dr. Evans had no specific memory of examining her, performing any tests on her or even talking with her on March 26. Notwithstanding this, the jury found that there was a sufficiently close patient-physician relationship to impose a duty on Dr. Evans to disclose in a reasonable manner all significant medical information that he possessed or reasonably should have possessed in 1985 that was material to an intelligent decision by Barbara Hall concerning her medical treatment. Halley *131 v. Birbiglia, 390 Mass. 540, 548-50 (1983). The only basis upon which the jury could properly have found that Dr. Evans had such a relationship with Barbara Hall was as the attending physician. In that capacity, he was responsible for any breach of a disclosure duty by Dr. Brand who was under his control and supervision. Id. at 549; see Barrette v. Hight, 353 Mass. 268 (1967). However, since the verdict against Dr. Brand on informed consent cannot stand, neither can the verdict against Dr. Evans because his duty to disclose information to Barbara Hall arises out of his role as Dr. Brand’s supervisor.
The jury awarded Danielle 18.5 million dollars in total compensation for her injuries; of this amount, more than 60 percent was allocated to future medical expenses and lost earning capacity. The remaining 7 million dollars was awarded for Danielle’s complete loss of bodily function, past and future pain and suffering and other items of general damage such as loss of enjoyment of life and the virtual absence of human dignity in her life. As to Barbara Hall, the jury awarded the sum of 1.5 million dollars for her loss of consortium. Defendants’ contentions that the damage award was excessive, punitive and against the weight of the evidence are not sufficient to merit the allowance of a motion for a new trial.
Plaintiffs economic expert, Harold Goldstein (Gold-stein), rendered opinions on Danielle’s future medical expenses and her lost earning capacity. The fact that the jury awarded a larger amount for special damages than Goldstein had calculated (about 1.5 million dollars more for future medical expenses and about 100,000 dollars more for lost earning capacity) does not in and of itself warrant the allowance of a motion for a new trial. The jury is allowed some latitude in its calculation of damage awards.
Additionally, the jury was not required to accept the exact figures presented by Goldstein. The court instructed the jury that they were not bound to accept an expert’s opinion merely because the witness was an expert. The jury was told to assess an expert’s testimony based on his background, training, and qualifications, as well as the other factors enumerated for evaluating a witness’s credibility. The amounts awarded were not so much greater than Goldstein’s opinion so as to conclude that there was no basis for them in the evidence.
The defendants’ other contentions about Goldstein’s methodology, including his choice of growth and discount rates, the time period used as the statistical sample, and the underlying assumption as to the initial value of wages and medical expenses were all subjects of cross-examination. The defendants did not present the jury with alternative economic testimony and relied solely on cross-examination to discredit Goldstein’s testimony.
The defendants also argue that the verdict cannot stand because it is the largest ever rendered in Massachusetts. As has been discussed, Danielle’s damage award was reasonably in line with the only economic evidence presented. Judgments about pain and suffering and loss of consortium are for the jury to make. Danielle’s injuries were catastrophic; indeed, it is difficult to imagine any more severe injuries short of death. Danielle requires round-the-clock intensive nursing care, assisted by machine monitoring. It is essentially hospital care given in a domiciliary setting by trained nurses. It was uncontested that her life expectancy would be for another 25 years or until the age of 32. In light of such facts, Danielle’s award was not disproportionate to her injuries.
Barbara Hall’s award of 1.5 million dollars was also not excessive. She testified compellingly about the impact of Danielle’s injuries on her relationship with her daughter; her loss was not contested by the defendants. The jury could have concluded that Barbara Hall was a loving and devoted mother who had been absolutely denied the right to the semblance of any normal mother-daughter relationship.
ORDER
For all the foregoing reasons, the motions for judgment notwithstanding the verdict and, in the alternative, for a new trial of the defendants, Ely Brand, M.D. and Stephen Evans, M.D. are ALLOWED only with respect to the informed consent claim and DENIED in all other respects.

 Since I find the plaintiffs’ proof flawed on this theory of informed consent for other reasons, I do not conclude that such a duty is recognized under Massachusetts law. No Massachusetts appellate court has considered the point.