Fabricant, J.
INTRODUCTION
This is an action for medical malpractice arising from a severe brain injury suffered by the plaintiff shortly after his birth at the defendant hospital. The hospital’s liability for the plaintiffs injury was established by default in a Memorandum of Decision and Order issued by this Court (Connolly, J.) on September 30, 1997 [7 Mass. L. Rptr. 473). In that decision the Court also struck the defendant’s affirmative defense *546 of charitable immunity. Thereafter, in a Memorandum of Decision and Order dated April 30, 1999, the same judge ruled that the earlier order established the element of causation as well as the element of negligence [10 Mass. L. Rptr. 41]. As a result of those two decisions, the sole issue remaining for trial was the amount of the plaintiffs damages. That issue came on for trial before the undersigned, jury-waived, on November 16, 1999. Over four trial days the parties presented the testimony of six witnesses, including the plaintiffs parents and four experts, and fifty exhibits. The exhibits include extensive medical and educational records, economic reports, articles in scholarly journals and treatises, and photographs and videotapes of the plaintiff engaged in his usual activities. The Court also took a view of the plaintiffs home and at that time observed the plaintiff in his home environment, along with some of the various devices and techniques used in his care. After the conclusion of the trial, counsel submitted proposed findings and rulings, with supporting memoranda, and then presented oral argument on February 11, 2000. Having considered all of the evidence presented and the arguments of counsel, I find and rule as follows.
I.BACKGROUND
1. Judge Connolly’s September 30, 1997, Memorandum of Decision recites the basic factual background as follows:
Dylan Keene was born on May 15, 1986. Shortly after his birth, Dylan showed signs of respiratory distress. By twenty-four hours of age, Dylan was in septic shock and by twenty-six hours of age he began having seizures. Subsequent EEG’s, CT imaging, and physical examinations showed severe brain damage. It was later determined that Dylan contracted meningitis which allegedly resulted in severe developmental problems.
The evidence presented at trial shows this description to be accurate. Factual questions as to when and how Dylan contracted meningitis, whether and when hospital personnel should have or did recognize and treat that condition, and whether and to what extent any inadequacy in treatment contributed to the consequences of the condition are all foreclosed by the default entered as to liability. I express no opinion as to the correctness of the default or of any other previous rulings in this case, but proceed from those rulings to the issues that remain. Accordingly, for purposes of the issues now pending, I assume that the injury for which Dylan is entitled to compensation in this action includes all aspects of his condition and of his experience of life that differentiate him from a normal child his age, born to and living in comparable circumstances. Thus, I assume for the purposes of assessing damages that, but for the negligence of the hospital as established by default, Dylan would have had all the characteristics and experiences of a healthy child born in 1986 to a family similar to his own.
2. Dylan is the first-born child of Kathleen and Robert Keene. He has two younger siblings, a sister born in 1993 and a brother born in 1998. Robert Keene operates a successful construction business. Kathleen Keene was twenty-three years old at the time of Dylan's birth. She has a background in bookkeeping, and assists her husband in his business while serving as primary caretaker for the couple’s three children. The family lives in a single-family home in Dover built by Robert Keene and adapted to make it accessible to Dylan’s wheelchair. Extended family members provide additional support to the family. Kathleen and Robert Keene have demonstrated an extremely high level of devotion to Dylan, and have developed a high level of skill in meeting his needs, including identifying and obtaining optimal medical, therapeutic, and educational services for him. The Keenes also demonstrate an appropriate awareness of the importance of balancing Dylan’s care with that of their other children and with the needs of their family as a whole.
3. Dylan has suffered profound brain damage. The manifestations of that damage include the following conditions, all of which are permanent. He has profound mental retardation, with his level of cognitive function at approximately that of a six-month-old child. He has spastic quadriplegia, such that he has little or no voluntary control of any part of his body. He turns his head in response to stimuli, but cannot lift his head. His vision is limited to some perception of light. He has scoliosis. He has chronic seizure disorder, such that he experiences regular daily seizures. He has thermoregulatory instability, so that his body is unable to maintain a constant temperature or to adjust to changes in environmental temperature. His temperature fluctuates between 86 and 106 degrees. Low temperatures cause his body systems to slow down, while high temperatures increase his seizures. He has chronic respiratory congestion. He experiences gastro-esophageal reflux,’ which presents a constant risk of aspiration of stomach contents and resulting respiratory impairment. Because of his reflux and associated medical problems and risks, in October of 1995 he underwent surgical insertion of a gastrostomy tube (“G-tube”); since then, he receives nutrition by means of a prescription liquid feeding formula through the tube directly to his stomach, and does not receive any food by mouth. He is incontinent of bowel and bladder, and suffers from chronic constipation. He is unable to participate in his own care in any way. He is and always has been unable to participate in any of the activities that non-disabled children ordinarily do, and he will be unable to participate in any form of work or adult leisure activity.
4. Dylan is unable to communicate through the use of language in any form. He manifests his reactions to sensations and stimuli through facial expressions and vocalizations, including smiling, grimacing, crying, and laughing. Through these manifestations, he demonstrates that he experiences both physical and men *547 tal pain and pleasure. Stimuli that elicit responses indicative of pleasure include the sounds of music and of the voices of the members of his family, their affectionate touch, the feeling of bathing in warm water, and the experience of being outdoors in mild weather. Dylan manifests pain or discomfort in connection with unpleasant physical conditions, such as constipation, in response to the various invasive procedures required for his care, after seizures, and at other times without identifiable cause. Throughout his life and continuing to the present, Dylan has had daily episodes of various lengths in which he cries or otherwise appears to be experiencing pain, discomfort, agitation, or distress. At times Dylan has shown facial expressions that his parents and others have interpreted as indicating particular emotions, such as fear (after seizures), anger (when forcefully aroused from a sleepy state for the purpose of engaging in therapeutic activity), or love (in response to his siblings’ voices and touch). It is impossible to evaluate the accuracy of these perceptions as to Dylan’s emotions. It is clear, however, that Dylan has a substantial range of positive and negative responses to his experiences, and that the experiences to which he responds include not only his own physical sensations, but also the emotional atmosphere among the people around him.
5. Although the parties presented no expert testimony directly on the point, it is apparent, and apparently undisputed, that Dylan does not have sufficient cognitive function to enable him to have any conscious awareness of his own disability, or of the differences between his condition and that of others. It follows that he has no awareness of the activities in which he cannot engage, or of the experiences that Eire unavailable to him. Similarly, it appears that he does not have the ability to anticipate future events, such as painful procedures, or to remember past experiences beyond recognizing familiar sensations.
6. Dylan’s parents have made a practice of taking him, along with their two younger children, on outings to various places and events that children generally enjoy, such as a local fair, a science center, Disney World, and another Florida resort. Inclusion of Dylan in such outings requires substantial planning, preparation, and expense beyond what would otherwise be necessary. Dylan’s responses to these outings have varied; at times he appears to enjoy the sounds, lights, and other sensations he experiences, and at other times he cries or otherwise exhibits discomfort or distress. These outings are important to the well-being of the family as a whole, and there can be no doubt that the overall well-being of Dylan’s family is of great importance to Dylan’s physical and emotional well-being.
7. Dylan was hospitalized for the first seven weeks of his life. He was then discharged to his parents, who have cared for him in their home ever since, with the exception of periods of short-term hospitalization and a period of a few weeks in 1988 during which he received inpatient evaluation at the Children’s Extended Care Center in Groton. From the time of his initial discharge, Dylan has experienced numerous emergency hospital admissions necessitated by a variety of medical conditions. His health has been more stable in the last few years than earlier, so that he has had fewer hospital admissions during this period than before, but he still has regular and frequent medical emergencies, and it is likely that he will continue to experience such events throughout his life. During his hospitalizations he has received a wide variety of tests and treatments that have been painful for him. Dylan experienced surgery for insertion of the G-tube in October 1995, with attendant pain and discomfort. It is likely that at some time in the future his scoliosis will necessitate surgery for the placement of rods in his back, with attendant pain and discomfort.
8. Dylan’s routine daily care requires the following regular procedures. His temperature is taken rectally at least four times each day. He is fed through his G-tube four times each day. His diaper is changed at least four times each day. He is dressed, bathed, and shaved. He is administered numerous medications at regular intervals throughout the day. He is placed in a back brace when he awakes and removed from it for sleeping. He receives chest physical therapy twice each day and nebulizer treatments three times each day in order to maintain the health of his lungs. He is lifted and moved about through the use of various kinds of lifts and wheelchairs. An adult is with him whenever he is awake, both to perform these procedures and to respond to any indication that he is experiencing reflux, having difficulty breathing, having a seizure, or is cold or hot. At night, Dylan’s parents monitor the sounds of his breathing by the use of a baby monitor. They regularly awaken and respond to his needs by adjusting his position, clothing or blankets.
9. In addition to his regular daily care, Dylan requires regular visits to physicians in a variety of specialties, including pediatrics, gastroenterology, cardiology, neurology, pulmonology, and orthopedics. In connection with these medical visits, he requires various laboratory tests and procedures, some of which involve pain or discomfort. He also receives frequent dental treatment because of increased risks to the health of his teeth and gums arising from his reflux and other conditions.
10. During his infancy, Dylan received various home health services, including physical, occupational, and speech therapies. From 1987 until 1992, Dylan attended the Fitchburg Center for Brain Injured Children. This required travel to and from his home in Dover to Fitchburg, a total of approximately three hours per day, during which he often experienced temperature fluctuations and seizures. The treatment provided at the Fitchburg Center included a technique *548 referred to as “patterning,” which at times he appeared to find painful. Since 1992, Dylan has attended the Boston College Campus School, where he receives physical, occupational, and speech therapies among a group of students with comparable conditions. It is more likely than not that Dylan will continue to attend that school until he reaches age twenty-two, when his eligibility for special education services under Massachusetts law will expire. A registered nurse accompanies Dylan on his van ride to and from school and remains with him throughout the school day to attend to his health-related needs and to be available in case of medical emergency. At home, a registered nurse is present during all of Dylan’s waking hours.
11. Dylan’s care requires, in addition to the physical tasks discussed supra, constant and continuous management and advocacy. Dylan’s mother has fulfilled this need throughout his life to date, spending substantial amounts of her time and energy in doing so. If she were to be unavailable for this purpose, this aspect of her care could be replaced to some degree, although probably not entirely, through the purchase of the services of some combination of professional case managers, consultants, and advocates.
12. Dylan will need care of essentially the kind and degree that he now receives for the rest of his life. Dylan’s parents have expressed every intention of continuing to care for him, as they do now, for as long as they are able. I find that they do so intend, and that it is more likely than not that they will do so. It may be anticipated, however, that their ability to meet his needs will be reduced in future years as the needs of their other children increase, and as they themselves age.
13. Dylan’s medical and other health care expenses at the time of his birth and for some period of time thereafter, not specified in the evidence, were covered by health insurance provided through the Harvard Community Health Plan. He then began to receive Medicaid benefits under the Kaileigh Mulligan Program. [1] That program provides funding for his health care needs, including home nursing services. The costs of Dylan’s educational placement at the Boston College Campus School, along with therapies provided there, transportation to and from the school, and the costs of the nurse who accompanies Dylan to school and attends to him throughout the school day, are covered by his local school district pursuant to G.L.c. 71B, §5, c. 766 of the acts of 1972.
fi. LIFE EXPECTANCY
The most significant contested issue of fact in this case is Dylan’s life expectancy. Discussion of this issue must begin with acknowledgment that it is impossible for anyone, under any circumstances, to predict with any confidence or reliability how long a particular individual will live. In addressing the issue of Dylan’s life expectancy, none of the witnesses in this case has purported to do so, nor do I. Nevertheless, in order to assess damages in this case, it is necessary to determine the period of time in the future for which the damages are intended to compensate. G.L.c. 231, §60F(b). That determination requires a finding of Dylan’s life expectancy, based on the preponderance of the credible evidence presented in this case.
Life expectancy is, by its nature, a matter of statistics. It is determined by identifying, as specifically as possible, the characteristics of an individual that are relevant to the likely length of that person’s life, and then determining the average length of life of the members of populations sharing those characteristics. The standard mortality tables commonly used in personal injury cases, compiled by the United States Department of Labor, are based on population groups categorized only by sex, race, and age, without regard to any particular risk factors arising from individual health, habits, or other characteristics. It is obvious, and undisputed, that Dylan has a number of characteristics that make his risk of death, at any point in his life, substantially greater than that of a hypothetical white male his age. It follows that standard mortality tables have little or no relevance to this case. Determination of Dylan’s life expectancy thus requires examination of data drawn from a population that shares, as closely as possible, those characteristics of Dylan that are relevant to his risk of mortality.
For this purpose, both parties have turned to a set of reports, published in scholarly journals, of studies conducted on a data set compiled by the California Department of Developmental Services. That agency provides services to residents of California with developmental disabilities, and in the course of doing so collects and compiles detailed information about the characteristics, conditions, and capabilities of its clients, using a standardized questionnaire submitted for each client annually. The resulting data set enables researchers to examine the actual experience of populations with particular combinations of relevant characteristics, so as to evaluate the effect of various factors on life expectancy.
The expert testimony presented by the parties in this case indicates that two of the published studies conducted on these data are of particular relevance: Richard K. Eyman, et al., “The Life Expectancy of Profoundly Handicapped People with Mental Retardation,” New England Journal of Medicine, August 30, 1990, at 584; and David J. Strauss, et al., “Life Expectancy and Median Survival Time in the Permanent Vegetative State,” Vol. 21 Pediatric Neurology (3) 626 (1999). In the former, Eyman and his colleagues examined data regarding 99,543 persons with developmental disabilities receiving services between 1984 and 1987. They categorized these people into subgroups, of which the one most relevant to Dylan consisted of 1550 people who had profound, severe, or suspected mental retardation, were incontinent and immobile, and required tube feeding. Of the members *549 of this group, for those who had lived to an age between ten and fourteen, the average number of years of life remaining was 4.8. For those who had lived to an age between 15 and 19, the average number of years oflife remaining was 4.5.
In the latter study, Strauss and his colleagues examined data regarding 194,168 clients of the California agency between 1981 and 1996. They identified a subgroup of 1,021 individuals with the lowest level of functioning in fifteen categories, including inability to lift head, lack of use of arm and hand, immobility, lack of self-care skills, and lack of receptive or expressive language,[2] and then considered the length of time each individual had exhibited those characteristics. The authors then employed a set of statistical modeling methods to project the effect of identified variables on death rates among this population. Through this approach, they found that persons who had reached age 15, and who had been in this category for at least four years, had a median survival time[3] of 7 years, and a life expectancy of 12.2 years, with those who were tube fed tending to die sooner than those who were capable of being fed by mouth.
Evaluation and interpretation of these studies, and application of their findings to draw conclusions regarding Dylan, requires expert testimony, which both parties provided. The plaintiff presented the testimony of Dr. Leslie Rubin, a pediatrician formerly affiliated with Children’s Hospital of Boston. Dr. Rubin served as Dylan’s primary physician between 1987 and 1994, when he left Boston to move to Georgia, where he now serves as Director of Developmental Pediatrics at Emory University School of Medicine. Dr. Rubin has extensive training and experience in the care of children with severe and complex disabilities, and has consulted, taught, and published in that field nationally and internationally for at least twenty years. Dr. Rubin came to know Dylan and his family very well during the seven years that Dylan was his patient, and refreshed his memory and updated his information during a visit over several days in 1999 in preparation for his testimony in this case.
In presenting his testimony, Dr. Rubin appeared to be highly knowledgeable in his field of developmental pediatrics, thoroughly dedicated to the welfare of his patient, and completely sincere in his effort to express his honest views. He did not demonstrate, and did not claim to have, any particular training, experience, or expertise in statistical methodology or in the determination of life expectancy. Indeed, Dr. Rubin acknowledged that this is the only time he has ever given a specific opinion as to the life expectancy of a particular individual.
In formulating an opinion about Dylan’s life expectancy, Dr. Rubin began with the conclusions expressed in the Eyman and Strauss studies discussed supra, noting particularly the seven-year median survival time for persons comparable to Dylan as found in the Strauss study. He then observed that Dylan is receiving care thát is in all respects exemplary, and that, in his clinical judgment, such high quality care would tend to mitigate the significance of Dylan’s various conditions as risk factors. Dr. Rubin assumed, without any identified basis, that of the members of the populations considered in the published studies, “more than two-thirds definitely had not had adequate care.” From this assumption, and his clinical experience generally, Dr. Rubin opined that Dylan’s life expectancy is at least twenty years. He acknowledged, however, that this figure is “just a guess,” and is not based on any systematic study of any population of patients with relevant characteristics similar to Dylan’s.
As noted supra, I find Dr. Rubin to be a very honest witness, with a high level of expertise in his field. I do not, however, credit his opinion as to Dylan’s life expectancy. I reach this conclusion because that opinion is simply without scientific basis. As Dr. Rubin himself acknowledged, it is essentially no more than a guess, informed by his general clinical experience, but not founded on any rigorous analysis of evidence, or application of any tested and validated methodology. I note also the likelihood that Dr. Rubin’s opinion on this point is influenced at least to some degree by his strong and longstanding relationship with the Keenes. Dr. Rubin is certainly not to be faulted for holding the Keenes in high regard, or for giving deference to their feelings about the likely life span of the child they so obviously love. My task, however, is to make a factual determination based on a dispassionate evaluation of credible evidence. Dr. Rubin’s opinion does not assist in this task.
The defendant offers the testimony of Dr. Mark Libenson, a pediatric neurologist affiliated with Tufts University and New England Medical Center. Dr. Libenson has outstanding academic credentials, substantial clinical experience in the care and treatment of children with neurologic disabilities, and extensive experience in clinical research. He also has substantial training and experience in statistical methodology. That training and experience enables him to interpret and evaluate statistically based studies, such as those discussed supra, with a high level of critical understanding, and to explain in a coherent and comprehensible way the conclusions that can and cannot be drawn from those studies. Dr. Libenson does not have any direct knowledge of Dylan, having never met or interviewed him or his parents. He has, however, reviewed the voluminous records of Dylan’s care and treatment. The factual assumptions regarding Dylan from which he formulated his opinions are consistent with the facts as reflected in the records and as testified to by Dylan’s parents and by Dr. Rubin.
Dr. Libenson opined that the conclusions expressed in the Eyman study warrant particular weight, because of the size of the population considered, the *550 reliability of the statistical methodology used, and the fact that it relied on actual observations rather than statistical modeling. He characterized the Strauss study as “the very most liberal approach to looking at this,” because it employs a statistical modeling method, “based on a much larger variety of assumptions,” rather than a “hard observational” approach. Based on his analysis of the published studies, in light of the facts of Dylan’s case, Dr. Libenson opined that Dylan’s life expectancy is in “a range of 4.8 to 12.2 years,” but that he would “lean toward the lower numbers” because of the more reliable methodology of the Eyman study, and because Dylan’s functional status is lower than some members of the group considered in the Strauss study, particularly with respect to his tube feeding, lack of head control, and temperature instability.
When asked about the significance of the quality of the care Dylan receives, Dr. Libenson made two points. First, he noted the absence of any reason, to believe that any significant proportion of the populations studied, all of whose members were receiving services from the responsible California public agency, received care outside the range of adequate. Second, he noted the absence of any research to indicate that the difference between adequate and optimal care makes a measurable difference in life expectancy for individuals with characteristics such as Dylan’s. For these reasons, he did not adjust his opinion as to life expectancy based on the quality of the care Dylan receives.
I credit Dr. Libenson’s opinion that Dylan’s life expectancy is in the range between 4.8 and 12.2 years from the time of trial, and that the factors he identified warrant adjustment toward the lower end of that range. The defendant proposes a finding of eight yéars, a figure just slightly below the middle of the range. That proposal is well founded in the evidence. Despite Dr. Libenson’s skepticism, however, I find that some upward adjustment is warranted for quality of care. The evidence is that no research supports such an adjustment, but also that no research refutes the proposition that optimal care would tend to increase life expectancy for a person such as Dylan. That proposition is so intuitively compelling, based on common sense and common understanding, that I am not prepared to reject it entirely in the absence of research supporting a conclusion either way. Accordingly, I adopt the figure of ten years as Dylan’s life expectancy from the time of trial, and will award future damages based on that figure.
Ifi. PAST MEDICAL EXPENSES
The plaintiff has put in evidence voluminous records of his medical, nursing, and therapeutic treatment throughout his life, beginning with his seven weeks as an inpatient after his birth, continuing through his recurrent emergency admissions over the years, some of which led to inpatient stays, and including his surgery in 1995. The evidence establishes also that the plaintiff receives the services of a registered nurse during his waking hours at home, and that he takes numerous medications daily. The plaintiff has not put in evidence bills for these services, but has put in evidence, without objection, a notice of lien from the Massachusetts Division of Medical Assistance, dated June 22, 1999, in the amount of $247,116.66. The records in evidence leave no room for doubt that the reasonable expenses incurred for the plaintiffs necessary medical, surgical, X-ray, dental, rehabilitative, hospital and nursing services and drugs and therapy prior to trial amount to at least the amount of the Medicaid lien, and probably substantially more than that amount.[4] Accordingly, I will award damages for past medical expenses, pursuant to G.L.c. 231, §60F(b)(l), in the amount of $247,116.66.
IV. LOSS OF EARNING CAPACITY
The parties have agreed that Dylan’s lost earning capacity, reduced to present value as of the date of the filing of this action in May 1995, is $740,000. Accordingly, I will award damages in that amount for lost earning capacity, pursuant to G.L.c. 231, §60F(b)(l).
V. SPECIAL EDUCATION SERVICES
The plaintiff has presented evidence that the annual cost of Dylan’s tuition at the Boston College Campus School, including physical, speech, and occupational therapy he receives there, is $35,253.00. The school district also provides Dylan with the services of a registered nurse to accompany him to and from school and remain with him throughout the school day, at a cost of $30 per hour, along with transportation to and from school.[5] Dylan does not seek damages for theses costs in the past, but does seek damages for these amounts for all future years until he reaches age twenty-two, and then for the costs of a comparable adult day program thereafter. He bases this claim on the contention that the local school district’s provision of special education services is analogous to collateral source payments, such as insurance reimbursement, “which do not have the effect of reducing the recovery against the defendant.” Restatement (Second) of Torts §920A, at 514 (1979); see Corsetti v. Stone Co., 396 Mass. 1, 17 (1985); Goldstein v. Gontarz, 364 Mass. 800, 808-09 (1974); but see G.L.c. 231, §60G (Supp. 1999) (establishing limited exception to collateral source rule in medical malpractice cases); see generally Note: “Unreason in the Law of Damages,” 77 Harvard Law Review 741 (1964). Based on that analogy, he contends that he is entitled to damages for the costs of all services necessitated by his injury, including special education and related services, regardless of any other source of payment for those services, including the local school district. I reject this contention, for the following reasons.
The plaintiff is entitled to damages for “reasonable expenses which have been incurred, or which will be incurred” for necessary services as a result of the *551 injury. G.L.c. 231, §60F(b)(l). It is beyond dispute that Dylan has not actually incurred any costs for his education and related services, and that absent substantial change in applicable law, he will not incur any costs for such services up to his twenty-second birthday. Rather, Dylan’s local school district provides him with educational services appropriate to his needs, tree of charge, and will continue to do so until he turns twenty-two, as required under both Massachusetts and federal law. See G.L.c. 7 IB, §§1, 5 (1996); 20 U.S.C. §1412(1999); 603 Code Mass. Regs. §28.201.3 (1993) (school district “may not require parents of children in need of special education to bear the costs of such special education”). Neither the school district nor any of the private vendors operating the programs he has attended has ever billed Dylan or his parents for services to him, nor is there any prospect that they would do so. Rather, for students who, like Dylan, require placement in a special program operated by a private vendor, the school district contracts with the vendor for placement of the student and payment of charges; neither the student nor the parents incur any costs. See 603 Code Mass. Regs. §28.201.1(b) (1993) (school committee may meet its obligation to provide special education by entering into contract with private school); see generally 603 Code Mass. Regs. 18.01 (regarding private special education placements).
A child’s need for education cannot fairly be said to be caused by an injury; every child needs education. An injury may render a particular child’s education more costly than it would otherwise be, but the additional cost does not fall to the child or his family; it falls to the school district, which by law cannot pass any part of the additional cost on to the family. A family may, of course, choose private education for a child with special needs, just as any family may choose private school; in that event, however, the cost is a result of the family’s choice, not of the injury giving rise to the special needs.
Moreover, the differences between special education services and collateral source benefits have substantial practical implications. With respect to the kinds of benefits to which the collateral source rule applies, the source generally has a right to receive reimbursement from any judgment recovered against a third party, through a contractual or statutory right of subrogation. See 22 Am.Jur.2d Damages §580; Note: “Unreason in the Law of Damages,” 77 Harvard Law Review at 742-43; cf. G.L.c. 231, §60G(c) (excluding from statutory exception to collateral source rule for medical malpractice cases benefits as to which federal source has right of subrogation under federal law); M. Bogdanow, Massachusetts Tort Damages (1999). Through this mechanism, the tortfeasor is ultimately required to reimburse the party that has actually paid the costs arising from the tort, and the plaintiff is prevented from obtaining double recovery. Indeed, in the case of benefits paid by a collateral source that has a right of subrogation, if the plaintiffs recovery were reduced on account of such payments, but the collateral source nevertheless exercised its right to reimbursement from the judgment, the result would be that the plaintiff would have to reimburse the collateral source from funds awarded to compensate for other aspects of the damages.
The Medicaid lien in this case illustrates the point. The Commonwealth’s Division of Medical Assistance willbe entitled to enforce its lien against the judgment, regardless of whether the judgment includes any amount for past medical expenses. Thus, inclusion of such an amount serves to transfer the cost of those expenses from the Commonwealth, which actually paid them, to the tortfeasor, which caused them to be incurred. The plaintiff obtains no double recovery, but also suffers no loss as a result of enforcement of the lien, as long as the judgment includes an amount for those costs. If, however, the Court were to deny Dylan damages for past medical costs on the ground that Medicaid or other health insurance paid them, the result would be that the lien would be enforced against funds included in the judgment as compensation for other damages, and intended for other purposes, and Dylan would be denied full recovery for his damages.
The situation with respect to special education is entirely different. Whether such costs are included in the damage award or not, the school district will have no right to recover them from anyone. The school district would continue to be required to provide the. services, at its own expense, without charge to Dylan, even if he were awarded damages for exactly the same purpose. See G.L.c. 71B, §5 (1999); 603 Code Mass. Regs. §28.201.3 (1993) (school committee may encourage but not require parents to use third party benefits or insurance coverage to pay costs of special education). Thus, a damage award for future educational and related services would not serve to transfer any costs to the defendant, nor would it relieve the school district of any burden placed on it by the defendant’s conduct. The only effect of such an award would be to give the plaintiff a windfall.
Reported Massachusetts decisions have not addressed this issue. Decisions in a few states have, with varied analyses and results. See C. Davis, Annotation, Collateral Source Rule: Admissibility of Evidence of Availability to Plaintiff of Free Public Special Education on Issue of Amount of Damages Recoverable from Defendant, 41 A.L.R. 5th 771 (1996). Decisions in Alabama, North Carolina and Connecticut have applied the collateral source rule to exclude evidence of publicly funded special education services, without in depth discussion of the differences noted supra between such services and other kinds of benefits subject to the rule. See Ensor v. Wilson, 519 So.2d 1244, 1266-67 (Ala. 1988) (approving exclusion of evidence based on collateral source rule, quoting Healy v. White, infra); Cates v. Wilson, 361 S.E.2d 734, 738-39 *552 (N.C. 1987) (ordering new trial due to admission of evidence of plaintiffs receipt of various benefits, including special education services as well as Medicaid, AFDC, child support, and gratuitous assistance from grandmother, without differentiation among types of benefits); Healy v. White, 378 A.2d 540, 546 (Conn. 1977) (approving award of damages including future education expenses, despite plaintiffs receipt of special education services provided by school district without charge). Compare, Tinnerholm v. Parke Davis Co., 285 F.Sup. 432, 453 (S.D.N.Y. 1968), affirmed as modified, 411 F.2d 48, 54 (2d Cir. 1969) (allowing recovery for future costs of care of severely handicapped child, despite evidence of care provided by public institution, where state law entitled state institution to recover from parents for costs of care).
In Illinois, two appellate courts reached seemingly contradictory results in decisions involving types of benefits that appear analogous. In Peterson v. Lou Bachrodt Chevrolet Co., 76 Ill.2d 353, 362-63 (1979), the Illinois Supreme Court held the collateral source rule inapplicable to medical services provided without charge by the Shriner’s Hospital, because the plaintiff had incurred no costs for those services. Six years later, however, the Appellate Court of Illinois approved a trial court’s exclusion of evidence of the availability of free governmental services for handicapped children, based on the “uncertainty of their availability in the future.” Northern Trust Co. v. County of Cook, 481 N.E.2d 957, 960 (Ill.App. 1985).
The Supreme Court of Florida, relying of the decision of the Illinois Supreme Court in Peterson, supra, has limited the collateral source rule to “those benefits earned in some way by the plaintiff.” Florida Physician’s Insurance Reciprocal v. Stanley, 452 So.2d 514, 515-16 (Fla. 1984). On this basis, that Court overruled a trial court decision excluding evidence of available charitable and government funded care for a child injured at birth. A decade later, in the opinion that is perhaps the most comprehensive and thoughtful treatment of this issue available in the case law, the Supreme Court of Missouri relied heavily on the Florida Court’s reasoning. Washington by Washington v. Barnes Hosp., 897 S.W.2d 611, 621 (Mo. 1995). The Missouri Court reviewed the various rationales for the collateral source rule, and concluded that none of them apply to publicly funded special education services, because every child in need of such services is entitled to them by law, without charge, without liability for reimbursement, and without regard to financial means. The Court noted that “(w)hile to some extent public schools are funded by plaintiffs tax dollars, they are also funded by defendant’s tax dollars and no windfall results to either. We reject the concept that the collateral source rule should be utilized solely to punish the defendant. Damages in our tort system are compensatory not punitive.” Id.
Having reviewed the relevant authorities in light of the purposes of the collateral source rule, I conclude that that rule is inapplicable to publicly funded special education services. Accordingly, the plaintiff is not entitled to any amount of damages for special education services, including nursing services, therapeutic services, and transportation provided by the school district as part of Dylan’s special education program pursuant to G.L.c. 71B, §5, c. 766 of the acts of 1972.[6]
Anticipated costs of an adult day program after Dylan reaches age 22 present a different issue. Any program Dylan attends at that point will be at his own expense, since his eligibility for publicly funded special education services will have expired. He is therefore entitled to damages to compensate for the costs of any such program that he has proven will be necessary as a result of his injury. The proof on this point, however, is sparse.
Dylan’s mother testified to her expectation that Dylan would attend such a program, and to general inquiries she has made regarding availability and costs, including availability of services through the state Department of Mental Retardation.[7] Based on information obtained through these general inquiries, she assumes that the cost would be approximately the same as the cost of his present school. The plaintiffs economic expert, Philip Saunders, adopted that assumption in calculating the costs of Dylan’s future care. The plaintiff did not provide any more specific evidence as to the nature of the services Dylan would receive from such a program, beyond nursing and therapeutic services, or how he would benefit from it. The defendant’s life care planning expert, Jane Matt-son, testified to the effect that assuming Dylan’s nursing and therapeutic needs are provided for at home, attendance at an adult day program would not benefit him, and might harm him by exposing him to unnecessary risk of infection.
Decisions as to Dylan’s best interests will, of course, be made by his family in consultation with appropriate professionals; they may well decide that the benefits of a group adult day program, either in cost efficiency or in social exposure, outweigh any risks. In that event, however, it could be expected that the cost of such a program would be offset, at least in large part, by savings in the costs of home nursing care and therapeutic services that would otherwise be provided at home. The plaintiffs evidence does not provide a basis for evaluating the effect of that offset, and identifying any net additional cost that would be reasonably necessary for an adult day program. I conclude, therefore, that the preponderance of the evidence presented does not support an award of damages for the cost of an adult day program.
VI. FUTURE MEDICAL AND OTHER LIFE CARE COSTS
As indicated supra, I find that Dylan’s life expectancy is ten years from the time of trial. He will need *553 full-time, comprehensive care, substantially equivalent to the care he now receives, throughout that time. In considering the damages to be awarded to enable Dylan to meet his various future needs, pursuant to G.L.c. 231, §60F(b)(l), I put those needs in three categories.
First are those of Dylan’s needs that are the same as or equivalent to the ordinary maintenance needs that apply to everyone. These include ordinary food, housing, transportation, recreation, and the like. These needs do not warrant any award of damages, since any person would have them, regardless of any injury. These needs are Dylan’s parents’ responsibility during his minority, and are covered thereafter by compensation for his loss of earning capacity.
A second category of Dylan’s needs consists of his need for care of the type that is and always has been provided by his parents, and that is within the skill and ability of parents generally, and within the range of care that parents are generally expected and required to provide for minor children. This category includes not only the physical care that Dylan’s parents provide, but the management, coordination, and advocacy that consumes a substantial proportion of his mother’s time and effort. I conclude that this need for the remainder of Dylan’s minority is not a proper basis for any award of damages. This conclusion should not be understood to suggest any lack of recognition of the burden that Dylan’s parents bear in caring for him; the evidence leaves no room for doubt that the Keenes have risen admirably to an extraordinary challenge, at high cost to themselves and the rest of their family. But the hardships the Keenes experience as a result of Dylan’s injury is their loss, not his, and is not encompassed in any claim presented in this case.
Dylan’s need for this kind of care will not change upon his majority, but his parents’ obligation will. The evidence establishes that it is more likely than not that Dylan’s parents will continue to take care of him in the same ways they do now after he reaches majority, but that is their choice, not their legal duty; they should not be forced into that choice by lack of funds for alternative care. It is appropriate, therefore, that the damages awarded to Dylan be sufficient to enable him to purchase all services necessary for his care, including those services now provided by his parents, from the time of his majority forward.
The third and final category of Dylan’s needs encompasses those that arise solely from his injury, and that go beyond both ordinary maintenance and the care that can reasonably be expected of his parents; these needs must be met through the purchase of goods other persons do not generally need, and through the purchase of professional services of various kinds. In awarding damages for future costs of care, my objective is to separate the costs that fall within these various categories, to exclude all those that fall within the first category and those within the second category up to Dylan’s eighteenth birthday, and to award those that fall within the second category from that date forward, along with all those that fall within the third category.
The evidence presented at trial regarding the costs of Dylan’s future care was in substance as follows. The plaintiff presented evidence of the care Dylan receives now, and has received in the past, through medical and school records, along with the testimony of his parents and of Dr. Rubin. As noted supra, the records submitted do not include any bills. In addition to his testimony, Dr. Rubin provided a report describing in general terms Dylan’s needs and the ways they can be expected to be met, and expressing the opinion that the overall costs of his future care, at its current level, can be expected to fall within a range between $185,000 and $310,000 per year, with an average cost of $250,000 per year.
The plaintiff also provides a report of economist Philip Saunders analyzing the costs of Dylan’s care. Dr. Saunders, according to the summary of his background appended to his report, “specializes in economic and financial analysis,” serving as consultant to “attorneys, commercial companies, banks, insurance companies, investors, the FDIC, and the U.S. Trustee [in bankruptcy],” and has a background of working in various capacities for banks and other financial and commercial entities. Dr. Saunders identifies as his sources of information Dr. Rubin's report, as well as his own communications with Dr. Rubin. Dr. Saunders sets forth an itemized list of cost elements, with cost figures for each element, without further explanation of the sources of those itemized cost figures.[8] He then projects those costs forward for assumed lifespans of twenty and thirty years, using figures for health-related costs set at levels to reflect differentials between inflation in general and in those kinds of costs. He adds these costs to arrive at total figures for each year, and then reduces the totals to present value as of the filing of this action on May 12, 1995. Through this process, he concludes that Dylan’s care for the year 2000 will cost a total of $280,064,[9] and that the present value of the total cost of Dylan’s care for the rest of his life is between $3,660,015 and $4,783,432, depending on certain assumptions as to life expectancy and discount rate.
The defendant responded to this evidence with the testimony and report of Dr. Jane Mattson, a “Certified Life Care Planner” with a Ph.D. in health and social welfare policy and nineteen years experience in life care planning and case management, specializing in clients with neurological injuries. Dr. Mattson reviewed Dylan’s medical and school records, noting in particular the nature and frequency of his medical visits and hospital admissions, and the particular medications he takes and supplies and devices used in his care. Based on this review, Dr. Mattson compiled *554 a detailed list of cost items, with cost figures for each. Her report concludes that Dylan’s care will cost $107,756 per year until he reaches age eighteen, and $107,796 per year thereafter,[10] plus $46,480 in nonrecurring costs.[11]
I have compared the reports of Drs. Saunders and Mattson in detail, with a view toward identifying the differences between them, and resolving those differences based on my evaluation of the relative credibility of their opinions. In considering the credibility of these experts, I note the following. Dr. Saunders, although apparently experienced and knowledgeable in economics and finance, does not present any identified experience or expertise in the particular field of most direct relevance here — the identification of the particular goods and services that will be needed over time by an individual with a particular set of disabling conditions, and of the necessary cost of obtaining those services in a cost-efficient manner. Dr. Rubin, from whom Dr. Saunders apparently obtained information about the nature of Dylan’s needs, certainly has expertise to support opinions on Dylan’s needs, but the record leaves considerable lack of clarity as to exactly what opinions he provided to Dr. Saunders and how Dr. Saunders used those opinions to obtain the figures set forth in his report for particular items. Indeed, there is some suggestion in Dr. Saunders’ report that he tailored his figures so as to arrive at a total amount consistent with the average figure proposed by Dr. Rubin, although the evidence provides little indication of how Dr. Rubin reached that figure, and does not indicate that he has expertise in the area of cost, as opposed to diagnosis and treatment. The testimony that Dr. Saunders’ figures are based on actual costs, as noted supra, does not solve this problem, without explanation of exactly how those figures are so based, and what information Dr. Saunders received as to what actual costs.
Dr. Mattson, in contrast, demonstrated substantial training and experience in the most directly relevant field. She also demonstrated, in her testimony and in her written report, a comprehensive understanding of Dylan’s medical history and condition that is fully consistent with Dr. Rubin’s and the Keenes’ testimony on that subject, and with the records in evidence. Her approach, as reflected in her analysis and conclusions, reflects appropriate attention to identifying items that include some element of ordinary maintenance, and adjusting for that element, and also to identifying the most cost-effective means of obtaining necessary goods and services.
The most significant difference between the figures presented by Dr. Saunders and Dr. Mattson is the figure for nursing care. Dr. Saunders’ initial figure of $180,000[12] per year is based on a registered nurse, twenty-four hours per day, year-round, at the $30 per hour rate that Kathleen Keene testified is now charged by the agency that supplies the nurses currently providing Dylan’s care. He then reduces that figure, based on Dr. Rubin’s opinion that “there may be savings in the cost of Dylan’s care, particularly in the level of nursing care,” “to approximately $146,000 per annum, in order to bring the overall annual total after year 2000 to $250,000.”
Dr. Mattson’s report allows $85,923 for nursing care, based on a licensed practical nurse, twelve hours per day for fifty-one weeks per year, and twenty-four hours a day for one week per year as a respite for the parents, with the nurses to be hired and paid by the family directly, rather than through an agency, at the rate of $18 per hour, plus allowances for payroll taxes and insurance.[13] Dr. Mattson acknowledged that she did . not account for weekends and other days when Dylan is not in school, and that an adjustment for those times would be appropriate. Dr. Mattson explained that she calculated based on a licensed practical nurse (LPN), rather than a registered nurse (RN), because the kinds of nursing services Dylan needs fall within the skills of an LPN, and do not require the higher skill level of an RN. The plaintiff did not refute that testimony; Kathleen Keene explained that the family uses an RN because the agency through which it obtains nursing services has been unable to supply an LPN, apparently for reasons related to market shortages. Dr. Mattson explained also that she recommends hiring nurses privately, rather than through an agency, because the former approach provides both a higher wage for the nurse and a lower cost to the customer, by eliminating the fee to the agency, which she testified tends to be set as high as half the hourly rate charged. The plaintiff also did not refute this testimony directly, but noted that the use of an agency spares the Keenes the burdens of screening, hiring, and training nurses, and of handling the paperwork that would necessarily be involved in their employing a staff of nurses directly.
For the reasons discussed in part V, supra, I do not consider it appropriate to award damages for the cost of the nursing services that are provided to Dylan during the school day, and during his transportation to and from school, at the expense of the local school district. I also do not find a need for nursing services at night prior to Dylan’s eighteenth birthday; the evidence does not establish that the care Dylan requires at night goes beyond the care that parents can reasonably be expected to provide for a minor child. For the reasons discussed, however, once Dylan reaches eighteen, he should be in a position to purchase the care he needs, without the necessity of relying on his parents; accordingly, as of his eighteenth birthday, he will need funds for nursing services at all times when he is not in school or traveling to or from school. Once he reaches age twenfy-two, and his eligibility for special education services expires, he will need nursing services twenty-four hours a day, every day. As to the choice between an RN and an LPN, and private hiring or agency hiring, I credit *555 Dr. Mattson’s opinion that private hiring of an LPN can meet Dylan’s needs with maximum cost efficiency, and that such services can be purchased at the rate of $ 18 per hour. The problem the Keenes raise regarding the burdens of employing nurses directly seems real and worthy of attention, but likely to be subject to solution through the use of a consultant for hiring and training, and a payroll service for paperwork. Dr. Mattson’s plan allocates a one-time cost of $1,500 for hiring and training; absent any conflicting evidence on the cost of such services, I will adopt that figure. The evidence does not indicate the cost of a payroll service; for present purposes, I will assume that such services can be purchased at a cost of five percent of the wages paid.[14] Thus, I will award damages for the cost of nursing services as follows, with each of the yearly amounts to be reduced to present value as of the date of the filing of this action:
1. For four and a half years (from the time of trial until Dylan’s eighteenth birthday), at the rate of $18 per hour plus ten percent for pay roll taxes and insurance and five percent for payroll services, for twelve hours per day on days when Dylan is in school, eighteen hours per day on days when Dylan is not in school, and twenty-four hours per day for one week each year. For this purpose I find, based on the testimony of Kathleen Keene and school records in evidence, that Dylan’s school runs eleven months per year, with the exception of vacations and holidays amounting to approximately four weeks per year, and that Dylan is absent from school because of illness or other reasons on approximately thirty school days per year. Accordingly, this calculation is based on twelve hours per day for one hundred and seventy days per year, eighteen hours per day for one hundred and eighty-eight days per year, and twenty-four hours per day for seven days per year, for an annual total of $115,755.[15]
2. For four years (from Dylan’s eighteenth birthday until his twenty-second birthday), at the same rate, for eighteen hours per day on days when Dylan is in school, and twenty-four hours per day on days when Dylan is not in school, an annual total of $160,218.
3. For one and a half years thereafter, the remainder of Dylan’s life expectancy as indicated supra, at the same rate, for twenty-four hours per day every day, an annual total of $181,332.
4. A one-time amount of $1,500 for hiring and training.
The other items contained in the life care plans presented by Dr. Saunders and Dr. Mattson are smaller, with areas of both agreement and disagreement. Dr. Mattson allows a one-time amount of $9,180 for “case management,” based on one hundred and eight hours at $85 per hour. Dr. Saunders does not provide for anything in this or an equivalent category. Dr. Mattson provides little explanation for this item, but I consider it warranted as a means of replacing, after Dylan’s majority, the services Kathleen Keene now provides in managing and coordinating his care and advocating for services for him. Accordingly, I will award $9,180 for this purpose.
Dr. Mattson also provides for a one-time cost of $35,800 for home modifications, a subject Dr. Saunders does not address. Based on the testimony of Dylan’s parents and my own observations in viewing his home, this amount is reasonably necessary. As Dylan grows to his full adult size, moving him about the house and bathing him will require more complete wheelchair access than now exists in the Keenes’ home. For this purpose, it will be necessary to widen certain doorways and to remodel the bathroom nearest to his room. Accordingly, I will award $35,800 for this purpose.
With respect to medical services, Dr. Mattson provides for an annual total of $7,140, assuming specified physician visits at specified rates, and three days of hospitalization per year. Dr. Saunders breaks these categories down somewhat differently, and makes some different assumptions about the charges for particular services, but his total, $8,172, is similar. I will adopt a figure halfway between these amounts, and accordingly, I will award damages for future medical and hospitalization costs in the amount of $7,656 per year for ten years, reduced to present value as of the date of the filing of the complaint.
The figures in the two reports differ more significantly for medications, disposable items and other supplies (such as diapers, syringes, and the like), and feeding formula. Dr. Saunders’ annual total for these areas is $27,571, including $3,960 for a medication, Zantac liquid, that he identifies as “discontinued,” $1,800 for unidentified “over-the-counter” items,[16] and $16,800 for prescription liquid feeding formula, without any deduction for the cost of the regular food that Dylan would otherwise require.[17] Dr. Mattson’s plan provides a total in these categories of $5,354, including $929 per year for medications, and $4,445 for “disposables.” She acknowledged in her testimony that she did not provide for some of the medications that Dylan has begun taking since she last reviewed his records, but testified also that some of the figures presented for medications in Dr. Saunders’ report, and for feeding formula, substantially exceed prices she is familiar with for the medications and formula listed.[18] I will resolve this dispute by subtracting the discontinued item from Dr. Saunders’ list, subtracting $5,000 for regular food that Dylan would otherwise need, and then adopting a figure half way between the remainder of Dr. Saunders’ total and Dr. Mattson’s total. Accordingly, I will award damages for future costs of medications, disposable items and supplies, and feeding formula in the amount of $13,237 per year, reduced to present value as of the date of filing of the complaint.
*556 The experts also differ significantly on the category of durable equipment. Dr. Saunders includes a list of items, with a cost for each annualized over 7.5 years, totaling $21,823 per year. The largest items in Dr. Saunders’ list are $4,333 per year as the annualized figure for the purchase of a wheelchair, said to cost $35,000 to $40,000, plus $12,500 per year for “wheelchair modification for patient growth,” making an annual total for the wheelchair of $16,833.
Dr. Mattson’s plan provides an annual total of $6,069 for the entire category of durable equipment. Her list specifies the particular items included, by brand or other specific name, and includes a larger number of items, with initial cost and replacement periods specified for each. Regarding Dr. Saunders’ figures for a wheelchair, Dr. Mattson testified that the type of wheelchair that would cost that much would be “for people that can control them electronically and can steer them quite good, and they’ll stand you up and things like that.”
With respect to this category, Dr. Mattson’s testimony is simply more credible than Dr. Saunders’ report. Her version demonstrates actual familiarity with the particular items involved, their role in the care of a person such as Dylan, and the intervals at which they need to be replaced, while Dr. Saunders’ version appears to be more hypothetical. With respect to the wheelchair in particular, Dr. Mattson’s challenge to Dr. Saunders’ figures is consistent with common sense and common experience; under Dr. Saunders’ version, Dylan would spend on a wheelchair every year an amount sufficient to buy a car, even though he cannot manipulate a wheelchair himself in any way. Accordingly, I will adopt Dr. Mattson’s figure for this category, and award damages for future costs for durable equipment in the amount of $6,069 per year for ten years, reduced to present value as of the date of the filing of the complaint.
Dr. Saunders’ plan includes $9,500 per year for physical, occupational, and speech therapy. Dr. Matt-son does not express any disagreement with this figure, but provides no amount for these services, because they are provided to Dylan at school. Although the evidence leaves room for some question on this point, it appears that these services are provided at school, as part of Dylan’s special education services, and that whatever additional services of this nature Dylan receives outside of school are provided by his home nurses, whose cost is already accounted for.[19] Accordingly, I will not award any amount for these services up to Dylan’s twenty-second birthday, but will award damages for these services, in the amount of $9,500 per year, for the period of one and a half years after he reaches age twenty-two, reduced to present value as of the date of the filing of the complaint.
The final item provided in both experts’ life care plans is transportation. Dr. Saunders provides for $27,500 for a “wheelchair van,” $1,000 per year for “annual upkeep and modifications to van,” and $22,500 per year for transportation to school until purchase of the van. Dr. Mattson provides $2,250 as the annualized amount for the extra cost of a wheelchair-modified van, based on a figure of $18,000 per year above the cost the family would otherwise incur for a family vehicle, to be replaced every eight years, with $1,000 for “additional fuel, maintenance, insurance.” She does not provide for transportation to school, since the school district provides transportation. For the reasons already discussed, I find this approach the more appropriate, and adopt it. Accordingly, I will award damages for future transportation costs necessitated by Dylan’s injury, above ordinary transportation costs, in the amount of $3,250 per year, reduced to present value as of the date of the filing of the complaint.
VII. GENERAL DAMAGES
The final, and perhaps most difficult, category of damages to be considered is damages “to compensate the plaintiff for pain and suffering, loss of companionship, embarrassment, and other items of general damages,” pursuant to G.L.c. 231, §60F(b)(3). The parties agree, and I find, that Dylan has suffered substantial and permanent impairment of multiple bodily functions, such that imposition of the limitation imposed by c. 231, §60H would deprive the plaintiff of just compensation for the injuries sustained. The parties disagree, however, on a fundamental and novel legal question that must be resolved in order to determine this category of damages: whether and how the plaintiff is entitled to compensation for the loss of the enjoyment of life that he would have experienced but for the injuiy.
The plaintiff contends that his damages should include compensation for the full range of experiences and opportunities that he would have had, but has not and will not have, because of his injuiy. Thus, for example, he points out that he has “lost the enjoyment of learning to ride a bicycle, playing with toys, developing friendships, reading books”; that he “has lost the normal relationship and companionship that he would have had with his brother and sister”; that he is unable to enjoy family outings and trips as he otherwise would have; that he will not experience sexual relations, marriage, parenthood, and home ownership; and that he will not have a career of his own. He seeks damages for all of these losses. The defendant opposes any award based on these kinds of losses, arguing that Massachusetts law allows damages for such losses only as a component of mental pain and suffering, to the extent that they actually give rise to such suffering by virtue of a plaintiffs conscious awareness of them. Noting that Dylan’s cognitive capacity makes him unable to have any such awareness, the defendant argues that Dylan experiences no pain or suffering by virtue of these kinds of losses, and therefore is entitled to no compensation *557 for them. In substance, the defendant’s argument is that damages are awarded only for losses actually experienced by the plaintiff, not for those merely incurred in the abstract.
The parties cite no Massachusetts authority addressing this issue directly, and I have found none. The closest analogy that appears in Massachusetts law is in the area of recovery for wrongful death. There, Massachusetts law limits recovery for the estate of the decedent to damages for conscious pain and suffering; no recovery is allowed for the decedent’s loss of life itself, even though its loss necessarily includes the loss of all of the pleasures the decedent would have experienced over the course of a normal lifespan. See G.L.c. 229, §6 (1985).
The parties rely on authorities from other jurisdictions. Of these, the two decisions addressing the question most directly are Flannery v. United States, 171 W.Va. 27, 297 S.E.2d 433 (W.Va. 1982), and McDougald v. Garber, 73 N.Y.2d 246, 536 N.E.2d 372 (N.Y. 1989). These decisions reach opposite conclusions under the law of West Virginia and New York, respectively.
The West Virginia Court holds that “a plaintiff in a personal injury action who has been rendered permanently semi-comatose is entitled to recover for the impairment of his capacity to enjoy life as a measure of the permanency of his injuries even though he may not be able to sense his loss of enjoyment of life.” 171 W.Va.2d at 33; 297 S.E.2d at 439. That Court does not discuss such considerations as the practical effect of the award or the benefits it can bring to the plaintiff, but relies primarily on earlier West Virginia authority allowing damages for loss of the ability “to function as a whole man.” 171 W.Va.2d at 32; 297 S.E.2d at 438 (citations omitted).
The New York Court provides a comprehensive and thoughtful discussion of the conceptual underpinnings of damages for non-pecuniary losses, noting that such damages rest on “the legal fiction that money damages can compensate for a victim’s injury,” but accepting that fiction because “a monetary award may provide a measure of solace for the condition created.” The Court goes on to state:
Our willingness to indulge this fiction comes to an end, however, when it ceases to serve the compensatory goals of tort recovery. When that limit is met, further indulgence can only result in assessing damages that are punitive. The question posed by this case, then, is whether an award of damages for loss of enjoyment of life to a person whose injuries preclude any awareness of the loss serves a compensatory purpose. We conclude that it does not.
Simply put, an award of money damages in such circumstances has no meaning or utility to the injured person. An award for the loss of enjoyment of life “cannot provide [such a victim) with any consolation or ease any burden resting on him. . . He cannot spend it upon necessities or pleasures. He cannot experience the pleasure of giving it away.”
73 N.Y.2d 246, 254-255; 536 N.E.2d at 375, quoting Flannery v. United States, 718 F.2d 108, 111 (4th Cir. 1983), cert denied, 467 U.S. 1226 (1984).
The reasoning of the New York Court is persuasive, and is fully applicable to this case. With the possible exception of family outings, there is nothing that Dylan’s damage award could be spent on that could give him any pleasure, in substitution or compensation for the pleasures he does not have by virtue of his injury. Nor could he derive any pleasure from the likelihood that the benefits of his damage award will ultimately fall to his survivors. Thus, an award of damages for such losses would not compensate Dylan in any meaningful sense, but would serve only to punish the defendant.[20] With limited exceptions not relevant here, however, Massachusetts law does not allow punitive damages. I conclude, therefore, that the general damages to be awarded under G.L.c. 231, §60F(b)(3), must be limited to compensation for physical and mental pain and suffering that Dylan has actually experienced and will actually experience in the future.
Determination of damages for Dylan’s pain and suffering is necessarily so imprecise as to be almost arbitrary. The effort rests entirely on the legal fiction, noted by the New York Court in McDougald, that money can provide solace. Clearly, in truth, it cannot. But there is no question that Dylan actually has and will experience physical and mental pain and suffering, and money damages are the only form of compensation available. The parties have offered, for this purpose, information about damage awards made by juries in other cases of severe neurologic injuries to young children. The plaintiff cites Hall v. Goldman, 1 Mass. L. Rptr. 128, 1993 Mass. Super. LEXIS 285 (Rouse, J. 1993), in which a judge of this Court allowed entry of judgment on a jury verdict including seven million dollars for general damages.[21] Apparently without reference to the amount in that case, the plaintiff proposes an award of general damages, including loss of enjoyment of life, and without separating out pain and suffering, in amounts for various periods totaling fifty-two million dollars. The defendant proposes a general damage award totaling one million dollars, which it represents is in proportion to jury awards in comparable cases in recent years.[22] These references to jury verdicts in other cases provide some assistance, but are not determinative; it is impossible to know what particular facts were presented in the evidence in those cases, or how those juries arrived at their figures. See Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 579 (1st Cir. 1989).
General Laws c. 231, §60F(b) requires that I allocate general damages between amounts intended to com *558 pensate for past and future losses. Although it is difficult to determine with certainty, the evidence suggests that Dylan experienced more physical and mental pain and suffering during his early years, before his condition and his needs were fully understood, and before arrangements for his optimal care were in place, than he has recently. Recognizing the inherently imprecise nature of this task, and without claiming any precision or accuracy, I will award general damages for the first ten years of Dylan’s life in the amount of $100,000 per year, and for each year thereafter in the amount of $50,000 per year. This amounts to a total of $1,175,000 for the period of time up to the time of trial, and $500,000 for the ten-year period after trial, for a total award for general damages of $1,675,000.
VIII. SUMMARY
As explained supra, damages are awarded as follows:
1. Past medical expenses: $ 247,116.66
2. Lost earning capacity: $ 740,000.00
3. General damages:
(a) past: $1, ,175,000.00
(b) future: $ 500,000
4. Future costs of care:
(a) one time costs (hiring and training nurses, case management, home alterations) $ 46,480.00
(b) annual amounts, to be reduced to present value as of date of filing:
(i) from trial to age eighteen $ 145,967.00
(ii) from age eighteen to age twenty-two $ 190,430.00
(iii) one and one-half years thereafter $ 221,044.00
IX. ORDER
The parties are directed to confer, in consultation with their economic experts, in an effort to reach agreement on the present ■'¿alue of the annual amounts, and if they are able to do so, then to submit a proposed form of judgment within thirty days. If the parties are unable to agree, they may submit alternative proposals supported by expert affidavits, within that time.

The Kaileigh Mulligan Program provides Medicaid funding for health care services for severely disabled children who need a level of care equivalent to that provided in a hospital or nursing home, but who live in their family homes, and whose families would not meet otherwise applicable financial eligibility requirements for Medicaid benefits. The program serves to enable such children “to remain at home.” See 130 Code Mass. Regs. §519.007 (1999).

The Strauss study uses the term "vegetative state” to describe this set of characteristics, although that term has a different meaning among neurologists. Dylan fits the definition of vegetative state in the Strauss study, but not as that term is used among neurologists.

Median survival time is the number of years at which half of the members of the group have died. Life expectancy is the average number of years of survival among all the members of the group. The latter tends to be a larger number because of the effect on the average of a small proportion of members who exhibit an unusually long life span.

This conclusion is without consideration of nursing services and therapies provided during the school day at school department expense.

The evidence does not indicate the cost of Dylan's school transportation.

The plaintiff argues that special education law could change in some way that would reduce or eliminate his eligibility for publicly funded services, so that costs would fall to him. Legal change is always possible, although change of the sort that he hypothesizes seems unlikely to occur within the time remaining before he reaches age 22. Other changes in law could also occur that would benefit him, such as enactment of a universal health care system that would fund his health care needs without charge to him, leaving him with the full benefit of the damages that will be awarded to him for future health care costs. But this case must be decided now, pursuant to the law as it is in effect now, without regard to possible legal changes.

In ruling on this issue, I do not assume that Dylan would receive any services from the DMR. Massachusetts law does not provide any entitlement to adult mental retardation services, but offers them at the discretion of the DMR, subject to available appropriated funds. See 115 Code Mass. Regs. §6.01 et seq. (1997). DMR has, and for many years has had, long waiting fists of persons eligible for its services but not receiving them for lack of funding. In assigning priority to an applicant such as Dylan, DMR would likely take into account the fact that he has a family willing and able to care for him, as well as his ability to purchase necessary services with funds recovered as damages in this action. See 115 Code Mass. Regs. §6.07 (1997).

Kathleen Keene testified that Dr. Saunders’ figures are based on actual cost experience in Dylan’s care, but did not provide further elaboration or documentation of that statement. I understand that testimony to indicate that the Keenes provided Dr. Saunders, either directly or through Dr. Rubin or otherwise, some specific figures as to amounts they have spent on some of the items included in his fist. The evidence does not indicate what specific information they provided as to what expenditures, or how Dr. Saunders used that ihfor-mation.

The annual amount for the year 2000 includes a one-time cost for the purchase of a van. As the plaintiffs’ proposed findings implicitly acknowledge, Dr. Saunder’s annual figures apparently reflect an arithmetic error in Dr. Saunders’ calculation of the cost of nursing care, resulting in an understatement of the annual total, according to his assumptions, by $82,800.

The $40 difference between these two figures apparently arises from the difference in charges for visits to a pediatrician up to age eighteen and an internist thereafter.

 Dr. Mattson assumes a fife expectancy of eight years, but does not attempt to calculate a total figure or to determine present value; the defendant offered the testimony of economist Allen Feldman for that purpose.

As noted supra, this figure reflects an arithmetic error; 24-hour a day care at that rate comes to $262,800.

Her allowance for payroll taxes and insurance appears to be at the total rate of ten percent.

If either party considers this figure unrealistic for this purpose, I would entertain any reasonable proposal for supplementation of the record so as to provide evidence on the cost of such services.

I invite counsel to check my calculations, and to attempt to reach agreement as to adjustments for any calculation errors they may discover.

These may include some of what Dr. Mattson categorizes as “disposables"; Dr. Saunders does not account for any such categoiy separately.

Dr. Saunders’ report indicates that this figure is “including pump." Dr. Mattson provides for a pump and stand, with replacement at stated intervals, in the category of durable equipment.

Kathleen Keene testified that the feeding formula costs $1,400 per month. I do not question her sincerity, but nevertheless do not accept that statement at face value, in the absence of documentation.

As noted supra, Dylan also receives daily chest physical therapy at home, but the evidence does not indicate that this is provided separately from his nursing care. I infer that it is provided by home nurses, without additional cost, and by his parents.

The same could perhaps be said of damages for the pain and suffering Dylan actually experiences. But no issue is presented in this case as to the plaintiffs right to such damages; the law seems clear, and the parties agree, that he is entitled to them.

The Court’s opinion in Hall leaves some uncertainty as to whether the plaintiff retained any capacity for conscious awareness of her condition.

Defendant represents, without contradiction from the plaintiff, that this figure is representative of jury awards in the fourteen cases in Massachusetts resulting in awards for neurological injuries to infants from 1995 to the present. It cites as the cases resulting in the two largest verdicts Saluti v. Ruan, Suffolk No. 92-5196-D (1996), and Lucas v. Stigol, Middlesex No. 96-1888 (1998).